UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TIMOTHY L. BURCHARD,

        Petitioner,

  -vs-

ELIOT SPITZER,

        Respondent.

**DECISION AND ORDER**

**No. 07-CV-0124T**

_____

## I.  Introduction

*Pro se* Petitioner, Timothy L. Burchard ("Petitioner"), has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered October 20, 2003, in New York State, County Court, Chemung County, convicting him, after a jury trial, of one count of murder in the Second Degree (intentional murder) (N.Y. Penal Law ("Penal Law") § 125.25[1]), and three counts of Murder in the Second Degree (felony murder) (Penal Law § 125.25[3]).

For the reasons stated below, habeas relief is denied and the petition is dismissed.

## II.  Factual Background and Procedural History

## A.  Introduction

In the early hours of October 5, 1997, Petitioner and Eric Weiskopff ("Weiskopff") entered the home of Constance Mauer

("Mauer" or "the victim") while her husband was out of town. Although they intended only to burglarize the home, when Mauer woke and startled them, Weiskopff raped her, then Petitioner raped and choked her, killing her. The two men threw her body down a flight of stairs to make her death appear accidental, and then set the curtains afire to hide any evidence left behind. A third accomplice, Jeremy Onsager ("Onsager"), waited outside in his car, and drove the two men away from the Mauer home, which burned down overnight.

The case remained unsolved until 2000 when Weiskopff was arrested in an unrelated matter. At that time, Weiskopff gave a statement to police that implicated Petitioner and Onsager.

On January 23, 2003, a Chemung County Grand Jury charged Petitioner with four counts of murder in the second degree. The first count charged intentional murder. The remaining three counts charged felony murder, under the theory that Petitioner had committed murder in the course of committing second degree burglary, first degree rape and first degree sexual abuse.

A jury trial commenced on June 11, 2003 before County Court Judge Peter C. Buckley. Petitioner did not testify.

## B. The Trial

In October 1997, Rusty and Constance Mauer lived together at 1636 Ridge Road in Horseheads, New York. Trial Transcript [T.T.] 90-96. During the first week of October 1997, when the victim's

husband was away from home, 18-year-old Onsager, 17-year-old
Weiskopff, and 20-year-old Petitioner, cruised Ridge and Middle
Roads in Onsager's car, breaking into parked cars, one of which
belonged to the victim. T.T. 218, 225, 441-43, 456-58. Petitioner
stole Mauer's purse from her truck, in which she kept a spare house
key. T.T. 225-26, 313-14. They brought the purse to Weiskopff's
house, split the money, and Petitioner took the spare house key.
T.T. 227-28. They then returned the purse to Mauer's truck. T.T.
228-29, 230.

In the early morning hours of October 5, 1997, Petitioner,
Weiskopff, and Onsager smoked marijuana and drank whiskey at
Weiskopff's home. T.T. 222, 230, 330, 337, 460-62, 517. At some
point, Petitioner pulled out Mauer's key and suggested that they
"check out" the Mauer house. T.T. 222-223, 319-320, 337, 462.
Onsager drove Petitioner and Weiskopff over to the Mauer house.
The men planned to burglarize the house while Onsager waited
outside in his car. T.T. 233, 464-65. When Petitioner and
Weiskopff left his car, Onsager fell asleep. T.T. 233, 465.

Petitioner entered the Mauer house through the front door with
the key, while Weiskopff searched through Mauer's unlocked car
looking for valuables. T.T. 230, 317, 340. Weiskopff found and
stole approximately $40 in cash. T.T. 231, 318. Weiskopff then
entered the house and began searching the main floor for valuables.
T.T. 234. He eventually went upstairs, where he found Mauer on the

floor, and Petitioner holding her down.  T.T. 237, 346.

Weiskopff and Petitioner then took turns holding Mauer down while the other raped her.  T.T. 239-46.  Weiskopff testified that it did not appear as though Petitioner ejaculated inside of Mauer.  T.T. 241-42.  When Mauer began to kick and scream, Petitioner choked her until she stopped moving.  T.T. 244-46.  They then carried her body to the top of the stairs, and pushed it down the stairs.  T.T. 250-51, 371.

The men continued to search the home for valuables, and, when they were done, wiped their fingerprints from the home.  T.T. 251-54.  Both men then set the house on fire.  T.T. 254-55, 372.  As the men left the house, Petitioner locked the front door.  T.T. 256, 374.  Onsager drove Petitioner and Weiskopff away from the scene.  T.T. 258, 374, 468-69, 470, 473.

Fire personnel and New York State Police processed the crime scene for almost a month.  T.T. 169, 424.  The police eventually recovered Mauer's body, which was badly burned and hardly recognizable.  T.T. 544-45, 803-809.

While the police were investigating the case in October of 1997, Petitioner visited his girlfriend, Stacy Pronti ("Pronti"), and told her about the events of October 5, 1997.  T.T. 551-52.  Pronti testified that Petitioner told her that he and Weiskopff had attempted to burglarize a house, and that the victim "wasn't supposed to be home."  Further, she testified that Petitioner told

her that he loved her and that he "didn't mean to rape the [victim], but that she wouldn't stop screaming." T.T. 552-53. Pronti also testified that Petitioner told her that he and Wesikopff set the house on fire in order to "take care of what had happened." T.T. 554, 560. Additionally, Pronti testified that, on a subsequent occasion, she wore a wire when she went to speak to Petitioner while he was at work. T.T. 561-64.

Dr. Cynthia Hoeflinger, a forensic pathologist with the Monroe County Medical Examiner's Office, performed an autopsy on the victim's body on October 6, 1997. She testified that the victim had died before the fire had started because there was no evidence of soot in the victim's airways or carbon monoxide in her blood. She also testified that she had taken swabs from the victim's oral, vaginal and rectal cavities and found sperm heads in her vaginal cavity. She testified that strangulation could not be ruled out as the cause of death, but, given the condition of the body, she was unable to determine the exact cause of death. T.T. 803-27. The sperm heads found in Mauer's body later turned out to match Weiskopff's DNA. T.T. 587-89.

In 2000, Weiskopff, after having been arrested in an unrelated matter, gave a statement to police regarding the October 5, 1997 incident, wherein he explained his role in the crime and implicated Petitioner and Onsager. Weiskopff provided police with a blood sample and also partook in polygraph testing, which he failed.

T.T. 279-84.  The police then met with Onsager, who had since moved to Texas.  Onsager refused to speak with police about the crime, but took a polygraph test, which he failed.  T.T. 479-80.

On January 26, 2002, Weiskopff was charged with Mauer's murder and related crimes.  T.T. 287-88, 305.  Onsager testified before the grand jury about the crimes in exchange for transactional immunity.  T.T. 483-84.

Three jailhouse informants, Dennis Jones ("Jones"), Andrew Strock ("Strock"), and Steve Seaman ("Seaman"), testified that while Petitioner was in prison for an unrelated crime, he had admitted to them his involvement in the October 5, 1997 crime.

After a jury trial commencing on June 11, 2003, Petitioner was found guilty as charged.  On October 20, 2003, he was sentenced to an indeterminate prison term of from 25 years to life with respect to each count of murder.  All of the sentences were ordered to run concurrently.  Petitioner was also ordered to pay restitution in the amount of $343,770.  Sentencing Minutes 35-36.

## C.  Direct Appeal

Petitioner appealed his judgment of conviction to the Appellate Division, Third Department, which was unanimously affirmed on July 28, 2005.  People v. Burchard, 20 A.D.3d 818 (3d Dep't 2005).  Leave to appeal to the New York State Court of Appeals was denied on October 11, 2005.  People v. Burchard, 5 N.Y.3d 851 (2005).

**D.  Collateral Motions**

On September 14, 2005, Petitioner moved, pursuant to New York Criminal Procedural Law ("CPL") § 440.10, to vacate the judgment of conviction, which was denied, on the merits, by the Chemung County Court on December 19, 2006.  See Decision & Order of the Chemung County Court, Ind. No. 2003-22, dated 12/19/06.  Leave to appeal the denial of the motion was denied by the Appellate Division, Third Department, on February 15, 2007.  See Decision of the Appellate Division, Third Department, dated 02/15/07.

**E.  The Habeas Corpus Petition**

On February 23, 2007, Petitioner filed the instant habeas corpus petition, wherein he seeks relief on the following grounds: (1) ineffective assistance of counsel due to a conflict of interest; (2) prosecutorial misconduct; and (3) that his statements made to his ex-girlfriend and three jailhouse informants were taken in violation of his right to counsel and his right against self-incrimination.  Petition [Pet.] ¶22A-C.

**III. General Principles Applicable to Habeas Review**

**A.  The AEDPA Standard of Review**

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a claim that was "adjudicated on the merits" in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." § 2254(d)(2). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not *dicta*) of the Supreme Court existing at the time of the relevant state-court decision. Williams, 529 U.S. at 412; accord Sevencan v. Herbert, 342 F.3d 69, 73-74 (2d Cir. 2002), cert. denied, 540 U.S. 1197 (2004).

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. Williams, 529 U.S. at 413; see also id. at 408-10. "[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently." Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001). Rather, "[t]he state

court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable." Id. This increment "need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct.  The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); see also Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), cert. denied sub nom. Parsad v. Fischer, 540 U.S. 1091 (2003).  A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

### B.  Exhaustion Requirement

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A);  see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838,

843-44 (1999);  accord, e.g., Bossett v. Walker, 41 F.3d 825, 828
(2d Cir.1994), cert. denied, 514 U.S. 1054 (1995). "The exhaustion
requirement is not satisfied unless the federal claim has been
'fairly presented' to the state courts." Daye v. Attorney General,
696 F.2d 186, 191 (2d Cir. 1982) (en banc), cert. denied, 464 U.S.
1048 (1984).

**IV.  Petitioner's Claims**

**1.    INEFFECTIVE ASSISTANCE OF COUNSEL DUE TO CONFLICT OF INTEREST**

Petitioner contends that his and his counsel's interests were
conflicted, such that he was deprived of his constitutional right
to the effective assistance of counsel.  Pet. ¶22A; Petitioner's
Supporting Memorandum [Memo.], 11-13; Traverse [Trv.], 11-13.  In
particular, he contends that his attorney previously served as the
District Attorney's campaign manager for his re-election, and that
this association interfered with his ability to effectively
represent Petitioner at the pre-trial Sandoval hearing.[1]  See id.
Petitioner raised this issue in his CPL § 440.10 motion, and it was
rejected on the merits.  Contrary to Petitioner's contention, the
trial court determined that, "[Petitioner] received aggressive,
cogent, and meaningful representation."  Decision & Order of the
Chemung County Court, Ind. No. 2003-22, dated 12/19/06, 2.

"The right to counsel under the Sixth Amendment entails a

---

[1]      At his Sandoval hearing, counsel withdrew his objection to the
prosecution's use of the facts surrounding Petitioner's prior crimes, if
Petitioner were to testify at trial.  See Memo., 11-13;  Trv., 12.

-10-

'correlative right to representation that is free from conflicts of interest.'" United States v. Levy, 25 F.3d 146, 152 (2d Cir. 1994) (quoting Wood v. Georgia, 450 U.S. 261, 271 (1981). A defendant will have suffered ineffective assistance of counsel in violation of his Sixth Amendment rights if his attorney has a per se conflict, an actual conflict that adversely affects the attorney's performance, or a potential conflict that results in prejudice to the defendant. See Levy, 25 F.3d at 152; Winkler v. Keane, 7 F.3d 304, 307 (2d Cir. 1993); Armienti v. United States, 234 F.3d 820, 823-24 (2d Cir. 2000).

For actual conflict claims, a defendant must establish the existence of an actual conflict, and then show that the conflict adversely affected defense counsel's performance. See Mickens v. Taylor, 535 U.S. 162, 171 (2002); Armienti, 234 F.3d at 811. An actual conflict between a lawyer and his client exists "when, during the course of the representation, the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action.'" Armienti, 234 F.3d at 824 (quoting Winkler, 7 F.3d at 307). If the defendant establishes that an actual conflict exists, "he need not prove prejudice, but simply that a 'lapse of representation' resulted from the conflict." United States v. Malpiedi, 62 F.3d 465, 469 (2d Cir. 1995) (quoting United States v. Iorizzo, 786 F.2d 52, 58 (2d Cir. 1986) (citations omitted). That is, the defendant must

"demonstrate that some 'plausible alternative defense strategy or tactic might have been pursued,' and that the 'alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'" Levy, 25 F.3d at 157. (quoting Winkler, 7 F.3d at 309).

Here, Petitioner has not demonstrated that an actual conflict existed. Assuming that Petitioner's counsel did act as the District Attorney's campaign manager[2], Petitioner is unable to show how his service in that capacity adversely affected his representation of Petitioner.

Petitioner argues, unconvincingly, that the alleged conflict interfered with counsel's performance at the pre-trial Sandoval hearing insomuch as counsel -- in an attempt to allegedly aid the prosecution in obtaining Petitioner's conviction -- withdrew his objection to a Sandoval ruling. See Memo., 11-13. Petitioner's position seems to be based on a belief that counsel's loyalty throughout the trial rested with the prosecution, not the defense. The Court finds this claim to be unsubstantiated and based on nothing more than rank speculation, as there is nothing in the record that suggests any aspect of counsel's performance was linked or compromised because of his association with the District Attorney's re-election campaign. Accordingly, the Court cannot

---

[2] The District Attorney neither confirmed nor denied this allegation in his state court filings.

find that the state court's adjudication of this claim contravened settled Supreme Court law.

Furthermore, the Court notes that Petitioner's claim also fails on the merits as a pure ineffective assistance of counsel claim under the general Strickland standard. To establish that he was deprived of his Sixth Amendment right to the effective assistance of trial counsel, a petitioner must show that (1) his attorney's performance was deficient, and that (2) this deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). Deficiency is measured by an objective standard of reasonableness, and prejudice is demonstrated by a showing of a "reasonable probability" that, but for counsel's unprofessional errors, the result of the trial would have been different. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." Id. To succeed, a petitioner challenging counsel's representation must overcome a "strong presumption that [his attorney's] conduct falls within the wide range of reasonable professional assistance." Id. at 689. A reviewing court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," id., and may not second-guess defense counsel's strategy. Id. at 690. Here, petitioner cannot demonstrate that his counsel's conduct was deficient within the meaning of Strickland, and that,

but for the deficiency, the result of his trial would likely have been different.

Petitioner suggests that, in addition to being a deliberate attempt to aid the prosecution in obtaining his conviction, counsel's decision to withdraw the objection to the <u>Sandoval</u> ruling was a poor professional decision that evinced a lack of clear trial strategy. The Court disagrees with Petitioner's assertion. Given the facts and circumstances of this emotionally-charged case, it was not unreasonable for counsel to withdraw the objection and agree to permit the prosecution to question Petitioner about the details of his prior crimes, insomuch as these crimes were less severe[3] in nature in comparison to the instant crimes. T.T. 50-1. By permitting the prosecution to question Petitioner about the details surrounding these prior crimes, it is plausible that counsel sought to show that murder, rape and arson were simply outside the realm of Petitioner's "specialty." Alternatively, it is plausible that counsel might have withdrawn the objection to the <u>Sandoval</u> ruling so that he could use Petitioner's testimony during the trial to show that Petitioner was open and honest in comparison to the "dishonest" jailhouse informants who testified against him. Thus, the Court cannot find that counsel's decision to withdraw the objection was unreasonable.

---

[3] The prior crimes at issue were two separate felony (non-violent) burglaries and several misdemeanor criminal mischief convictions. T.T. 50-51.

In any event, Petitioner cannot show that he suffered prejudice from the allegedly deficient performance. Petitioner makes a general conjecture that, "the strange and questionable abdication of defense counsel's unknown strategy on the first day of trial resulted in myself not taking the stand on my own behalf." Memo., 13. This statement, however, viewed in the context of the entire trial, amounts to nothing more than a generalized, after-the-fact expression of his dissatisfaction with the outcome of the trial, which is not a sufficient basis for a successful ineffective assistance of counsel claim. See Albanese v. United States, 415 F.Supp.2d 244, 254 (citing United States v. Garguilo, 324 F.2d 795, 797 (2d Cir. 1963) ("A convicted defendant is a dissatisfied client, and the very fact of his conviction will seem to him proof positive of his counsel's incompetence.")). And, given the wealth of evidence against Petitioner, the gruesome nature of the crime, and the emotionally-charged environment surrounding the trial, it is highly unlikely that the outcome of the trial would have been different had counsel not withdrawn his objection to the Sandoval ruling.

Accordingly, the claim is dismissed.

## 2. PROSECUTORIAL MISCONDUCT

Petitioner contends that the prosecutor engaged in misconduct when he: (1) improperly elicited polygraph testimony from prosecution witnesses; and (2) improperly granted transactional

immunity or plea bargains in exchange for testimony that was used against Petitioner. Pet. ¶22B; Memo., 7-10. Petitioner raised this claim on direct appeal, and it was rejected on the merits.

"[P]rosecutorial misconduct cannot give rise to a constitutional claim unless the prosecutor's acts constitute 'egregious misconduct.'" Miranda v. Bennett, 322 F.3d 171, 180 (2d Cir. 2003) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 647-48 (1974)). A court must review allegations of prosecutorial misconduct "in the context of the entire trial." Miranda, 322 F.3d at 180. However, "[t]he appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" Floyd v. Meachum, 907 F.2d 347, 353 (2d Cir. 1990) (quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)). Prosecutorial misconduct warrants a reversal only when the effect is "so prejudicial that [it] render[s] the trial in question fundamentally unfair." Id. (quoting Garofolo v. Coomb, 804 F.2d 201, 206 (2d Cir. 1986)). In deciding whether a defendant has suffered prejudice of due process proportions as a result of prosecutorial misconduct, courts have considered, (1) the severity of the misconduct; (2) the measures adopted to cure the misconduct; (3) and the certainty of conviction absent the improper statements. See Floyd v. Meachum, 907 F.2d 347, 355 (2d Cir. 1990) (quoting United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981) (per

curiam)) (internal quotation marks omitted)); accord United States v. Parker, 903 F.2d 91, 98 (2d Cir. 1990).

Here, Petitioner contends that the prosecutor engaged in misconduct when he made reference, on several occasions throughout the trial, to polygraph testing.  In particular, Petitioner argues that this conduct not only violated the trial court's ruling that the results of such tests could not be introduced, but it also "left [the jury] with the impression that Weiskopff may have passed the test" when, in fact, he had not.  Memo., 9.

Petitioner has not shown that the prosecutor's conduct in this respect was so egregious that it rendered the trial fundamentally unfair.  See Garofolo, 804 F.2d at 206.

The record reflects that in each instance where the prosecutor made mention to the polygraph tests, an objection was immediately lodged by the defense and sustained by the trial court.  T.T. 290, 480-81, 727-28, 761, 960-61.

Additionally, both Weiskopff and Onsager testified at the trial that they had lied to police when they were questioned about their involvement in the October 5, 1997 incident.  Thus, the jury's credibility assessment of Weiskopff and Onsager, individually and/or collectively, did not solely rest on the single fact that polygraph testing had been administered to both of them.

Furthermore, none of the prosecution's references to the polygraph testing were made in regard to Petitioner.  No mention

was ever made whether Petitioner himself underwent polygraph testing and/or whether he passed or failed such testing.  <u>Cf.</u> <u>Wynters v. Poole</u>, 464 F. Supp.2d 167 (W.D.N.Y. Feb. 13, 2007) (habeas relief granted where prosecutor's improper references to petitioner's constitutional rights, coupled with introduction of prejudicial information that petitioner had refused to take a polygraph test and counsel's failure to object thereto, amounted to denial of due process).  And, to the extent Petitioner suggests that the prosecution's references to the testing throughout the trial -- without specific reference to him -- created a negative implication that he underwent polygraph testing and failed, while Weiskopff and Onsager passed, is simply conjecture.

Next, Petitioner contends that the prosecution's use of immunity and plea bargaining to obtain evidence against Petitioner deprived him a fair trial.  In particular, he contends that the use of such immunity was a means for the prosecutor to settle a "vendetta" against him, while allowing Onsager to "[get] off scott-free."  Memo., 7.  Petitioner's contention, as discussed below, does not provide a basis for habeas relief.

At the outset, the Court notes that the prosecution and the police, over the course of several years, sought, and were also independently provided with, statements from various jailhouse informants, Weiskopff, Pronti, and Onsager identifying Petitioner as the individual who raped and killed Mauer.  The collection of

this evidence was in large part hampered by Petitioner's and Weiskopff's deliberate destruction of evidence, including killing Mauer to silence her, and then burning her body to hide any physical evidence of rape or strangulation. Nonetheless, the prosecutor presented the admissible evidence he received from the jailhouse informants, Weiskopff, Pronti and Onsager to the jury to prove Petitioner's guilt, and it was the jury who ultimately determined whether these individuals were telling the truth. That the prosecution used immunity and plea bargaining to obtain the evidence from these individuals does not, by itself, constitute improper conduct. See Santobello v. New York, 404 U.S. 257, 260 (1971) (recognizing that plea bargaining "is an essential component of the administration of justice. Properly administered, it is to be encouraged."). Accordingly, the prosecutor's conduct furnishes no basis for finding a constitutional violation warranting habeas relief.

The Court therefore cannot find that the state court's determination of this issue was contrary to or an unreasonable application of settled Supreme Court law. The claim is dismissed.

## 3. **MASSIAH** VIOLATION

Petitioner contends that his statements to the three jailhouse informants and to his ex-girlfriend, Pronti, were admitted in violation of his constitutional right to counsel and his right against self-incrimination. More specifically, he argues that the

statements were taken and used in violation of the Supreme Court holding in <u>Massiah v. United States</u>,[4] and subsequent cases extending therefrom. Petitioner raised this claim on direct appeal, and it was rejected on the merits.

In <u>Massiah</u>, the Supreme Court held that once a defendant's Sixth Amendment right to counsel attaches, the government may not "deliberately elicit[]" inculpatory information from the defendant "in the absence of counsel," and explicitly applied this prohibition to the use of undercover agents or government informants for the purposes of obtaining such statements. <u>See</u> <u>Massiah v. United States</u>, 377 U.S. 201, 206-07 (1964).

The Court of Appeals for the Second Circuit has explained that "the <u>Massiah</u> rule covers only those statements obtained as a result of an intentional effort on the part of the government, so information gotten before the inmates become agents/informants is not protected by the rule." <u>United States v. Stevens</u>, 83 F.3d 60, 64 (2d Cir. 1996). Moreover, the <u>Massiah</u> rule does not apply to statements made completely voluntarily by an accused. <u>Id.</u> (citing <u>United States v. Accardi</u>, 342 F.2d 697, 701 (2d Cir.), <u>cert.</u> <u>denied</u>, 382 U.S. 954 (1965)).

The Appellate Division's rejection of Petitioner's claim that the trial court wrongly admitted his statements to the jailhouse informants and to Pronti is not contrary to the above principles.

---

[4]     <u>Massiah v. United States</u>, 377 U.S. 201 (1964).

The record shows that inmate Jones met Petitioner in October 2002 -- nearly three months before Petitioner was indicted -- to discuss parole violation procedures. T.T. 633, 619, 640-41. Jones testified that he, along with his lawyer, met with the District Attorney on November 5, 2002 to provide the District Attorney with information on an unrelated case. T.T. 635. At that time, when the District Attorney asked Jones if he knew anything else, Jones relayed his conversations with Petitioner. T.T. 637.

Similarly, inmate Strock testified that he initially spoke with Petitioner in October 2002 because they shared the same parole officer. In the course of their conversations, Petitioner revealed to him various details about the October 5, 1997 crime. Strock testified that after Petitioner was indicted for the October 5, 1997, he contacted the District Attorney and offered to provide them with the information Petitioner had provided to him. T.T. 652-66.

Likewise, the record shows that inmate Seaman spoke with Petitioner prior to his indictment, and that the incriminating statements Petitioner made to Seaman were made voluntarily. Seaman testified that Petitioner made statements to him after the time Petitioner was indicted, but that he did not approach the police with Petitioner's admissions. Rather, the police came to the Shuyler County Jail to interview him. Seaman did not testify -- and there is nothing in the record that suggests -- that the

government encouraged the contact between Seaman and Petitioner. T.T. 592.

Finally, Petitioner's initial statements to Pronti in October of 1997 were made voluntarily before he was indicted for the October 5, 1997 crimes. The statements Petitioner subsequently made to Pronti when she was wearing a wire -- at the behest of police -- were not offered into evidence, and, therefore, could not have weighed in on the jury's decisionmaking process. See Diaz v. Smith, 2007 U.S. Dist. LEXIS 25225, *39-40 (S.D.N.Y. March 27, 2007) ("[a]s the record makes plain, it is irrelevant whether [the informant's] actions resulted in the elicitation of statements in contravention of [Petitioner's] rights under the Sixth Amendment, since neither those statements nor any evidence pertaining to their content was admitted into evidence.").

Thus, the Appellate Division's rejection of Petitioner's Massiah claim is not contrary to established Supreme Court law. Habeas relief is not available to Petitioner and the claim is dismissed.

## V. Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), I decline to issue a certificate of

-22-

appealability.  See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000).  The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person.  Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

 s/Michael A. Telesca
MICHAEL A. TELESCA
United States District Judge

DATED:    February 24, 2010
          Rochester, New York